**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 22-cv-02364-NYW-SBP

THE HOMEOWNERS ASSOCIATION OF PLAYERS CLUB VILLAS TOWNHOMES,
INC.,

      Plaintiff,

v.

QBE INSURANCE CORPORATION,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment ("Plaintiff's Motion for Summary Judgment"), [Doc. 51], and Defendant's Motion for Partial Summary Judgment ("Defendant's Motion for Summary Judgment"), [Doc. 52]. Upon review of the Motions and the related briefing, the applicable case law, and the record before the Court, the Court concludes that oral argument would not materially assist in the resolution of these matters. For the following reasons, Plaintiff's Motion for Summary Judgment is respectfully **DENIED** and Defendant's Motion for Summary Judgment is respectfully **GRANTED**.

## BACKGROUND

This case arises out of a hailstorm and subsequent dispute over the payment of insurance benefits between Plaintiff The Homeowners Association of Players Club Villa Townhomes, Inc. ("Plaintiff" or "PCV") and its insurance company, QBE Insurance Corporation ("Defendant" or "QBE"). *See* [Doc. 1]. PCV asserts three claims against

QBE related to the benefits dispute: (1) breach of contract; (2) bad faith breach of insurance contract ("common law bad faith"); and (3) unreasonable delay or denial of insurance benefits in violation of Colo. Rev. Stat. §§ 10-3-1115 and -1116 ("statutory bad faith"). [*Id.* at ¶¶ 33–69].

Both Parties have filed motions under Rule 56 of the Federal Rules of Civil Procedure seeking partial summary judgment in their favor. Plaintiff seeks summary judgment in its favor on its statutory bad faith claim and asks the Court to rule that (a) QBE materially breached the insurance contract, and (b) as a result, QBE is not entitled to reduce PCV's damage by the amount of the deductible provided for in the contract. *See* [Doc. 51]. Defendant seeks summary judgment in its favor on Plaintiff's bad faith claims, on Plaintiff's request for punitive damages, and as to the applicability of a hail deductible provision in the insurance contract. *See* [Doc. 52]. Both Motions are fully briefed, *see* [Doc. 54; Doc. 55; Doc. 63; Doc. 64], and the Court considers them below.

## LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if there is sufficient evidence so that a rational trier of fact could resolve the issue either way. A fact is material if under the substantive law it is essential to the proper disposition of the claim." *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1194 (10th Cir. 2011) (citation and quotations omitted).

"Cross-motions for summary judgment are treated as two individual motions for summary judgment and held to the same standard." *Banner Bank v. First Am. Title Ins.*

*Co.*, 916 F.3d 1323, 1326 (10th Cir. 2019); *see also Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."). However, the summary-judgment burden slightly differs depending on which party bears the ultimate burden at trial. A movant that does not bear the ultimate burden of persuasion at trial does not need to disprove the other party's claim; rather, the movant must only point the Court to a lack of evidence for the other party on an essential element of that party's claim. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998). Once this movant has met its initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). But "if the moving party has the burden of proof [at trial], a more stringent summary judgment standard applies." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). A moving party who bears the burden at trial "must establish, as a matter of law, all essential elements of the issue before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Id.*

When considering the evidence in the record, the Court cannot and does not weigh the evidence or determine the credibility of witnesses. *See Fogarty v. Gallegos*, 523 F.3d 1147, 1165 (10th Cir. 2008). At all times, the Court views each motion in the light most favorable to the nonmoving party. *Banner Bank*, 916 F.3d at 1326.

## UNDISPUTED MATERIAL FACTS

The material facts below are drawn from the summary judgment record and are undisputed unless otherwise noted.

pg 4 of 26

1.      On or about June 5, 2021, a hailstorm caused damage to PCV's property, which consists of 86 townhomes in 43 buildings (the "Property").  [Doc. 21 at 6; Doc. 51-2; Doc. 52 at ¶¶ 2, 4; Doc. 54 at 6 ¶¶ 2, 4].

2.      At the time of the hailstorm, PCV held an insurance policy through QBE (the "Policy").  [Doc. 21 at 4; Doc. 51-4; Doc. 52 at ¶¶ 1, 4; Doc. 54 at 6 ¶¶ 1, 4].

3.      The Policy provides commercial property coverage insurance for the Property.  [Doc. 21 at 4; Doc. 52 at ¶ 2; Doc. 54 at 6 ¶ 2].

4.      The damage to the Property is a covered loss under the Policy, which provides for "guaranteed replacement cost" in the event of a covered loss.  [Doc. 21 at 6; Doc. 51-4 at 8; Doc. 51-5 at 14; Doc. 51 at ¶¶ 3–4; Doc. 55 at 3 ¶¶ 3–4].

5.      The Policy states that coverage is subject to a five percent "Hail Deductible" that applies per building.  [Doc. 51-5 at 5, 13; Doc. 51 at ¶ 4; Doc. 55 at 3 ¶ 4; Doc. 52-1 at ¶ 3; Doc. 52-2 at 2 (Hail Deductible Endorsement); Doc. 52-3 (Statement of Values)].

6.      The Hail Deductible is calculated based upon the "Statement of Values" for each building on the Property as set forth in the Policy, with values ranging from $505,190 to $792,428.  [Doc. 52-1 at ¶ 3; Doc. 52-2 at 2; Doc. 52-3; Doc. 52 at ¶ 3].[1]

7.      On or about June 9, 2021, PCV filed a claim with QBE (the "Claim").  [Doc. 21 at 6; Doc. 52 at ¶ 5; Doc. 54 at 6 ¶ 5].

---

[1] PCV attempts to dispute this fact with attorney argument that "[t]he Policy deductible applies only to the adjustment process, not to damages in breach of contract and bad faith litigation," and "QBE cannot benefit from the deductible because it materially breached the Policy," [Doc. 54 at 1 ¶ 3 (citing Section I of Plaintiff's Response to Defendant's Motion for Summary Judgment)], and a citation to the declaration of Plaintiff's counsel, Alan T. Dickey, [id. (citing [Doc. 51-1])].  Attorney argument is insufficient to create a dispute of fact.  See Openwater Safety IV, LLC v. Great Lakes Ins. SE, 435 F. Supp. 3d 1142, 1148 n.6 (D. Colo. 2020).  The Court thus considers this fact undisputed. Fed. R. Civ. P. 56(e)(2).

8.     QBE retained an independent adjuster, Jon Asp ("Mr. Asp"), to assist in the adjustment of the Claim.  [Doc. 21 at 6; Doc. 52 at ¶ 6; Doc. 54 at 6 ¶ 6].

9.     QBE hired Peter Marxhausen ("Mr. Marxhausen") at Unified Building Sciences & Engineering, Inc. ("UBSE") to inspect the Property.  [Doc. 21 at 6; Doc. 51 at ¶ 12; Doc. 52 at ¶ 9; Doc. 54 at 6 ¶ 9].

10.     On July 15, 2021, PCV hired Ron Cooper ("Mr. Cooper") as its public adjuster.  [Doc. 21 at 6; Doc. 51-7; Doc. 52 at ¶ 10; Doc. 54 at 6 ¶ 10].

11.     UBSE inspected all 43 building roofs at the Property and disputed that all 43 roofs needed to be replaced.  [Doc. 52-5 at 25:10–28:11, 60:4–61:19;[2] Doc. 52 at ¶¶ 11–12; Doc. 54 at 6 ¶¶ 11–12].

12.     On August 9, 2021, UBSE issued a report (the "UBSE Report") regarding the damage to the Property from the June 2021 hailstorm to QBE.  [Doc. 21 at 6; Doc. 51-2; Doc. 51 at ¶ 14; Doc. 55 at 4 ¶ 14].

13.     By letter dated September 21, 2021, QBE outlined its position and made payment to PCV in the amount of $1,587.05, explaining that this amount was the actual cash value (or "ACV") for the loss as outlined in the Policy and payment terms, less the Hail Deductible and recoverable appreciation.  [Doc. 52-1 at ¶ 5; Doc. 52-6 (September 21, 2021 letter from QBE to PCV); Doc. 52 at ¶ 13; Doc. 54 at 6 ¶ 13].[3]

---

[2] When citing to transcripts, the Court cites to the page and line numbers appearing on the transcript.  In all other instances, the Court cites to the page numbers generated by the CM/ECF system.

[3] The Court notes that the Parties refer to payment and communications on September 21, 2021, [Doc. 52 at ¶ 13; Doc. 54 at 1 ¶ 13], and September 22, 2021, [Doc. 51 at ¶¶ 22–23; Doc. 55 at 4 ¶¶ 22–23], respectively.  The Court need not resolve this discrepancy because resolution of the same is not material to the Court's analysis.

14.    QBE's desk adjuster, Kristina Burkey ("Ms. Burkey"), advised Mr. Asp that the $1,587.05 payment was "a pretty minimal payment of a little over $1k." [Doc. 51-5 at 8; Doc. 51 at ¶ 24; Doc. 55 at 4 ¶ 24].

15.    On February 16, 2022, Mr. Cooper provided a two-page estimate to QBE, demanding repairs in the amount of $3,467,487.63 for the replacement of all 43 roofs at the Property, based on an estimate from "Core Contractors." [Doc. 21 at 6; Doc. 51-15; Doc. 51 at ¶ 26; Doc. 55 at 4 ¶ 26; Doc. 52 at ¶ 14; Doc. 54 at 6 ¶ 14].[4]

16.    On March 10, 2022, Mr. Asp emailed Ms. Burkey:  "It doesn't appear we released the [UBSE] engineer report to [PCV] or [Mr. Cooper]." [Doc. 51-5 at 3; Doc. 51-10; Doc. 51 at ¶ 27; Doc. 55 at 4 ¶ 27].

17.    That same day, after Ms. Burkey "[r]eviewed the report again and gave the approval," [Doc. 51-5 at 3; Doc. 51-10; Doc. 51 at ¶ 27; Doc. 55 at 4 ¶ 27], Mr. Asp sent the USBE Report to Mr. Cooper, [Doc. 51-17; Doc. 51 at ¶ 28; Doc. 55 at 5 ¶ 28].

18.    Ms. Burkey later testified that QBE's failure to send the USBE Report earlier was an "error." [Doc. 51-8 at 55:14–56:14; Doc. 51 at ¶ 28; Doc. 55 at 5 ¶ 28].

19.    On June 2, 2022, PCV retained Engineering Specialists Incorporated ("ESI") to inspect the Property. [Doc. 21 at 5; Doc. 52 at ¶ 15; Doc. 54 at 6 ¶ 15].

20.    On June 14, 2022, an ESI certified environmental specialist inspected 5 of the 43 roofs at the Property. [Doc. 52-7 at 44:1–22, 57:20–59:3; Doc. 52 at ¶ 16; Doc. 54 at 6 ¶ 16].

---

[4] Again, the Parties refer to communications on February 16, 2022, [Doc. 52 at ¶ 14], and February 17, 2022, [Doc. 51 at ¶ 26], respectively.  The Court need not resolve this discrepancy because resolution of the same is not material to the Court's analysis.

21.    On July 7, 2022, ESI generated a report (the "ESI Report"), stamped under the Colorado professional engineering license of Paul Douglas, alleging that all 43 roofs on the Property needed to be replaced.  [Doc. 52-7 at 59:15–23; Doc. 52 at ¶ 17; Doc. 54 at 6 ¶ 17].

22.    PCV's counsel provided the ESI Report to QBE on August 1, 2022, with a request that QBE reevaluate its coverage position within 14 days.  [Doc. 51-24; Doc. 21 at 6; Doc. 51 at ¶ 36; Doc. 55 at 5 ¶ 36].

23.    On August 17, 2022, PVC's counsel emailed Ms. Burkey asking whether QBE's continued silence meant the carrier was not interested in a "fair settlement of the claim."  [Doc. 51-25 at 2; Doc. 51 at ¶ 38; Doc. 55 at 5 ¶ 38].

24.    Ms. Burkey did not respond to the August 1, 2022 letter or the August 17, 2022 email from PVC's counsel before PVC initiated the instant action on September 14, 2022.  [Doc. 51-8 at 61:9–63:8; Doc. 51-24; Doc. 51-25 at 2; Doc. 51 at ¶¶ 36–40; Doc. 55 at 5 ¶¶ 36–40].

25.    On September 1, 2023, QBE's cost expert, Andrew Lonergan ("Mr. Lonergan"), issued an expert report (the "Lonergan Report").  [Doc. 51-26].  Mr. Lonergan relied on the UBSE Report to calculate PCV's replacement cost value as "$608,531 or $118,159 after [the] deductible."  [*Id.* at 5; Doc. 51-27 at 25:16–26:1; Doc. 51 at ¶ 43; Doc. 55 at 6 ¶ 43].

**ANALYSIS**

I.    **Defendant's Motion for Summary Judgment**

    A.    **Application of the Policy's 5% Hail Deductible**

The first question before this Court is whether the Policy's "5% Hail Deductible" provision applies to PCV's Claim.  *See* [Doc. 52 at 7–10].  Because this Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, *see* [Doc. 1 at ¶ 5], the Court applies the substantive law of the forum state, *Barrett v. Tallon*, 30 F.3d 1296, 1300 (10th Cir. 1994).  Colorado law provides that interpretation of an insurance contract is "governed by the law of the state with the most significant relationship to the insurance contract."  *Berry & Murphy, P.C. v. Carolina Cas. Ins. Co.*, 586 F.3d 803, 808 (10th Cir. 2009).  Because the Parties agree that Colorado law applies, *see* [Doc. 51 at 13; Doc. 52 at 6 n.1], the Court proceeds accordingly, *see Grynberg v. Total S.A.*, 538 F.3d 1336, 1346 (10th Cir. 2008) ("Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption.").

        1.    **Applicable Law**

"An insurance policy's terms are construed according to principles of contract interpretation:  a court seeks to give effect to the intent and reasonable expectations of the parties."  *Auto-Owners Ins. Co. v. High Country Coatings, Inc.*, 388 F. Supp. 3d 1328, 1333 (D. Colo. 2019).  Under this approach, "words should be given their plain and ordinary meaning unless the intent of the parties, as expressed in the contract, indicates that an alternative interpretation is intended."  *Chacon v. Am. Fam. Mut. Ins. Co.*, 788 P.2d 748, 750 (Colo. 1990).  "In determining the plain and ordinary meaning of a term in an insurance policy, the Colorado Supreme Court has eschewed the use of 'technical

readings' and instead looks to 'what meaning a person of ordinary intelligence would attach to' a policy term." *Sullivan v. Nationwide Affinity Ins. Co. of Am.*, 842 F. App'x 251, 254 (10th Cir. 2021) (quoting *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1051 (Colo. 2011)).

### 2.    Analysis

QBE seeks summary judgment as to whether the Hail Deductible "applies to this Claim and QBE's obligation to pay under the Policy only applies to amounts in excess of the Hail Deductible applicable to each building." [Doc. 52 at 7]. The Policy provides, in pertinent part:

> The Windstorm or Hail Deductible, as shown in the Schedule and Set forth in this endorsement, applies to covered loss or damage caused directly or indirectly by Windstorm or Hail. This Deductible applies to each occurrence of Windstorm or Hail.
>
> …
>
> **WINDSTORM OR HAIL DEDUCTIBLE CALCULATIONS**
>
> **A. Calculation Of The Deductible – All Policies**
>
> **1.** A Deductible is calculated separately for, and applies separately to:
>
>> **a.** Each building[ ]that sustains loss or damage;
>>
>> **b.** The personal property at each building at which there is loss or damage to personal property; and
>>
>> **c.** Personal property in the open.
>
> If there is damage to both a building and personal property in that building, separate deductibles apply to the building and to the personal property.
>
> **2.** We will not pay for loss or damage until the amount of loss or damage exceeds the applicable Deductible. We will then pay the amount of loss or damage in excess of that Deductible, up to the applicable Limit of Insurance, after any reduction required by any of the following: Coinsurance Condition; Agreed Value Optional Coverage; or any provision in a Value Reporting Form relating to full reporting or failure to submit reports.

[Doc. 52-2 at 1].

The Parties agree that the Hail Deductible (a) unambiguously applies per building, *see* [Doc. 52-8 at 8], and (b) is a valid provision that applies to the adjustment of PCV's Claim, [Doc. 54 at 17].  However, PCV argues that whether the Hail Deductible applies in this case turns on whether QBE materially breached the Policy by underpaying PCV's claim, such that the Hail Deductible no longer applies.  [Doc. 54 at 13–17].  The Court respectfully disagrees.

As a threshold matter, the Court finds PCV's reliance on *Coors v. Security Life of Denver Insurance Company*, 112 P.3d 59 (Colo. 2005), and its progeny misplaced.  The applicability of a deductible in an insurance policy was not at issue in *Coors*.  *Id.*  Rather, the Colorado Supreme Court considered the enforceability of an early termination penalty. *Id.* at 62.  In that case, the insurer overcharged its insured nearly $90,000, and then— after the insured exercised his right to cancel the policy upon this material breach of the insurance contract—the insurer attempted to recover a $111,000 penalty from the insured under the policy's early termination provision.  *Id.* at 63–64.  The Colorado Supreme Court held that the insurer's material breach of the policy "relieved [the insured] of any obligation to pay a termination penalty."  *Id.* at 64.

An unambiguous *deductible* in an insurance policy,[5] however, applies notwithstanding an insured's claims for breach of insurance contract and bad faith.  *Cf.*

---

[5] A deductible is "a clause in an insurance policy that relieves the insurer of responsibility for an initial specified loss of the kind insured against."  *Deductible*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/deductible (last accessed Mar. 21, 2025).  In other words, the "deductible" portion of an insured's loss is borne by the insured, whereas any loss that exceeds the deductible is borne by the insurer.  *See Deductible*, Black's Law Dictionary, 519 (11th ed. 2019).

*Avalon Condo. Ass'n v. Secura Ins. Co.*, No. 14-cv-00200-CMA-KMT, 2015 WL 5655528, at *6 (D. Colo. Sep. 25, 2015) (granting insurer's motion for summary judgment because insurer properly calculated and applied hail deductible to insured condominium complex's claim for loss due to hailstorm damage, notwithstanding insured's breach of contract and bad faith claims premised on insurer's failure to pay larger sum under the policy); *Residences at Olde Town Square Ass'n v. Travelers Cas. Ins. Co. of Am.*, 430 F. Supp. 3d 743, 758 (D. Colo. 2019) (granting insurer's motion for partial summary judgment on grounds that hail deductible was properly applied to insured's condominium complex's claim arising out of hailstorm damage).  Even so, PCV argues—without any supporting legal authority—that "[a] deductible is not any different than a penalty that an insured must pay in order [to] obtain payment of an insurance claim."  [Doc. 54 at 14–15].  Without more, PCV asserts that "if the insured in *Coors* was entitled to free insurance, then surely QBE should not get the benefit of a deductible."  [*Id.* at 15].  The Court respectfully finds PCV's attempt to analogize penalty provisions and deductibles both underdeveloped and unpersuasive.

At bottom, a deductible is neither a penalty nor a "benefit" under an insurance policy; rather, it is "a mechanism for shifting risk from the insurer to the insured." *Penthouse Owners Ass'n, Inc. v. Certain Underwriters at Lloyds, London*, 612 F.3d 383, 387 (5th Cir. 2010).  Indeed, "[t]he purpose of a deductible is to shift some of the insurer's risk (that is, covered risk) to the insured, which is accomplished by setting a limit on the value of covered losses below which the insurer is not obligated to pay."  *Id.* (citing 12 Couch on Ins. 3d § 178:1 ("A provision commonly found in [insurance] policies is the so-called 'deductible clause,' whereby a stated sum is deductible from the *amount for which*

*the insurer would otherwise be liable*.")) (further citations omitted).    Accordingly, deductibles "operate more like a policy limit than a defense to coverage," insofar as they "function as an *apportionment of loss* between the insurer and the insured."  *W. Heritage Ins. Co. v. Asphalt Wizards*, 795 F.3d 832, 837 (8th Cir. 2015) (emphasis added); *see also id.* ("To hold that the deductible endorsements can be waived would, like barring an insurer from asserting policy limits, create coverage where none existed under the policy in the first place." (quotation omitted)).

A penalty provision, by contrast, generally provides for "a sum which a party agrees to pay but which is fixed as a punishment—the threat of which is designed to prevent [a particular] breach."  *See FidoTV Channel, Inc. v. Inspirational Network, Inc.*, No. 18-cv-02295-CMA-NYW, 2021 WL 2400083, at *1 (D. Colo. June 11, 2021) (applying North Carolina law); *see also Penalty Clause*, Black's Law Dictionary (12th ed. 2024) (defining "penalty clause" as a generally unenforceable "contractual provision that assesses against a defaulting party an excessive monetary charge unrelated to actual harm").

Finally, PCV concedes that QBE's application of the Hail Deductible—pursuant to the unambiguous terms of the Policy—was appropriate in QBE's adjustment of the claim. [Doc. 54 at 6 ¶ 3].  PCV provides no authority for the proposition that a deductible applied in the adjustment of a claim is somehow void in subsequent litigation *over the adjustment of the claim.*  [*Id.* at 13–17].  Thus, the Court concludes as a matter of law that the Hail Deductible applies to PCV's Claim and QBE's obligation to pay under the Policy applies only insofar as PCV's losses exceed the Hail Deductible applicable to each building.

B.    **Bad Faith Claims**

QBE moves for summary judgment in its favor on both of Plaintiff's bad faith claims arising under Colorado statute and common law.  *See generally* [Doc. 52].

1.    **Applicable Law**

There are two types of bad faith claims available under Colorado law:  common law bad faith and statutory bad faith.  *Dowgiallo v. Allstate Ins. Co.*, No. 19-cv-03035-KMT, 2020 WL 1890668, at *2 (D. Colo. Apr. 16, 2020).  Colorado statutes impose certain obligations on insurance companies, instructing that insurers "shall not unreasonably delay or deny payment of a claim for benefits owed to or on behalf of any first-party claimant."  Colo. Rev. Stat. § 10-3-1115(1)(a).  To succeed on a claim under this statute, an insured must establish that (1) the insurer delayed or denied payment of benefits to the insured, and (2) the delay or denial was without a reasonable basis.  *Am. Fam. Mut. Ins. Co. v. Barriga*, 418 P.3d 1181, 1185–86 (Colo. 2018).

Insurers also have common law duties to deal in good faith with their insureds.  *Am. Fam. Mut. Ins. Co. v. Allen*, 102 P.3d 333, 342 (Colo. 2004).  "Due to the 'special nature of the insurance contract and the relationship which exists between the insurer and the insured,' an insurer's breach of the duty of good faith and fair dealing gives rise to a separate cause of action arising in tort."  *Goodson v. Am. Standard Ins. Co. of Wis.*, 89 P.3d 409, 414 (Colo. 2004) (quoting *Cary v. United of Omaha Life Ins. Co.*, 68 P.3d 462, 466 (Colo. 2003)).  "The requirements of a common law bad faith claim under Colorado law are heightened in comparison to those of a statutory bad faith claim."  *Butman Fam. Inv. Ltd. P'ship v. Owners Ins. Co.*, No. 19-cv-01638-KLM, 2020 WL 1470801, at *8 (D. Colo. Mar. 25, 2020).  In addition to demonstrating that the insurer

delayed or denied benefits without a reasonable basis, "a common law insurance bad faith claim requires the insured to [prove] . . . that the insurer knowingly or recklessly disregarded the validity of the insured's claim." *Id.*

"The reasonableness of the insurer's conduct is determined objectively and is 'based on proof of industry standards.'" *Schultz v. GEICO Cas. Co.*, 429 P.3d 844, 847 (Colo. 2018) (quoting *Goodson*, 89 P.3d at 415); *see also Bankr. Est. of Morris v. COPIC Ins. Co.*, 192 P.3d 519, 523 (Colo. App. 2008) ("[T]he question is whether a reasonable insurer under the circumstances would have denied or delayed payment of the claim."). Typically, whether an insurance company acted reasonably in the handling of a claim for benefits is a "question of fact for the jury." *Vaccaro v. Am. Fam. Ins. Grp.*, 275 P.3d 750, 759 (Colo. App. 2012). But "in appropriate circumstances," such as "when there are no genuine issues of material fact, reasonableness may be decided as a matter of law." *Id.*

Unreasonableness is an essential element of both bad faith claims under Colorado law and it is evaluated objectively, based on industry standards. *Schultz*, 429 P.3d at 847. "These standards may be established through expert opinions or state law." *Peden v. State Farm Mut. Auto. Ins. Co.*, 841 F.3d 887, 890 (10th Cir. 2016). In moving for summary judgment on Plaintiff's bad faith claims, "Defendant here ha[s] the initial burden . . . of either (1) providing evidence that Defendant complied with industry standards applicable to the facts of this case, or (2) pointing out that Plaintiff lacked evidence of an objective industry standard applicable to the facts of this case showing that Defendant acted unreasonably." *Copper Creek Inc. v. State Farm Fire & Cas. Co.*, No. 21-cv-01603-NYW-MEH, 2022 WL 17454493, at *13 (D. Colo. Dec. 6, 2022) (emphasis added) (quotation omitted).

### 2.    Analysis

Because QBE expressly argues that PCV can neither put forth sufficient evidence of applicable industry standards nor show how QBE failed to meet those standards, *see, e.g.*, [Doc. 52 at 12–13], PCV was required to come forward with sufficient proof of industry standards governing its bad faith claims to demonstrate a triable question as to whether QBE's conduct was unreasonable, *see Anderson*, 477 U.S. at 248; *see also Jewell v. State Farm Mut. Auto. Ins. Co.*, No. 18-cv-02536-KLM, 2020 WL 1627348, at *5 n.6 (D. Colo. Feb. 26, 2020) ("Of course, if Defendant had properly made either of these arguments in its Motion . . ., Plaintiffs would then have been required to put forth sufficient evidence of applicable industry standards such that a reasonable jury could find in their favor.").    In response, PCV purports to identify an "avalanche" of undisputed facts supporting QBE's bad faith, [Doc. 54 at 16–24], but fails to even address Defendant's express argument that PCV has "failed to disclose any person to testify to objective evidence of industry standards or that QBE's conduct was in violation of industry standards," [Doc. 52 at 12].  Nor does PCV put forth evidence of—or even identify—the industry standards that QBE's conduct allegedly violates.[6]  *See generally* [Doc. 54].  This is fatal to PCV's bad faith claims.

---

[6] The Court notes that Plaintiff raises arguments under the industry standards set forth in Colo. Rev. Stat. § 10-3-1104(1)(h) in Plaintiff's Reply in support of its Motion for Summary Judgment.  [Doc. 63 at 9–10].  But Plaintiff does not raise this argument or cite § 10-3-1104(1)(h) in either Plaintiff's Motion for Summary Judgment, [Doc. 51], or in Plaintiff's Response to Defendant's Motion for Summary Judgment, [Doc. 54].  Arguments raised for the first time on Reply are generally deemed waived.  *See Cahill v. Am. Fam. Mut. Ins. Co.*, 610 F.3d 1235, 1239 (10th Cir. 2010) (arguments first raised in a reply brief come too late); *Ulibarri v. City & County of Denver*, 742 F. Supp. 2d 1192, 1218 (D. Colo. 2010) (argument first raised in reply brief may be disregarded).  Even assuming that the Court considered Plaintiff's arguments about industry standards set forth in Colo. Rev. Stat. § 10-3-1104(1)(h), PCV does not demonstrate how or through whom it would introduce

To that end, the Court finds *Wak Inc. v. Ohio Security Insurance Co.*, No. 16-cv-01191-MSK-MJW, 2019 WL 859709 (D. Colo. Feb. 22, 2019), though not binding, nevertheless on point and persuasive. In *Wak*, the defendant insurance company inspected a property damaged by a 2014 hailstorm within weeks of its insured's claim and later issued a "partial denial" letter to its insured after it determined that the plaintiff's covered loss was less than the plaintiff's $1,000 deductible. *Id.* at *3. The insured later sued and, in opposing the insurance company's motion for summary judgment, pointed to a much higher 2016 appraisal award (more than $130,000 and $90,000 for replacement cost and actual cash value, respectively) as evidence that the insurance company's 2014 loss calculation was unreasonable. *Id.* Even though the parties in *Wak* disagreed as to whether an expert was required to opine on the insurer's bad faith, the court declined to reach that issue because the plaintiff failed to submit *any* evidence of industry standards—expert or otherwise—to support his bad faith claims. *Id.* at *5. Because the plaintiff failed to identify governing industry standards or how his insurer deviated from the same when it made the "unreasonable" 2014 determination, the court found that the plaintiff had failed to come forward with evidence sufficient to demonstrate

---

admissible testimony about the statute. *See Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006) (observing that while a party need not submit evidence in a form that would be admissible at trial at summary judgment, it must demonstrate that the content or substance of the evidence would be admissible); *Turner v. State Farm Mut. Auto. Ins. Co.*, No. 13-cv-01843-MSK-NYW, 2015 WL 3526995, at *4 (D. Colo. June 4, 2015) (observing that standards imposed by law are not per se industry standards and applicable legal standards are left to the province of the court, not an expert). Nothing in Ms. Burkey's deposition testimony that is quoted by Plaintiff addresses industry standards or the adoption of the Colorado statute as industry standards; "important" does not establish an industry standard. *See* [Doc. 63 at 11].

the insurer's unreasonableness.  *Id*.  Accordingly, the court granted summary judgment to the defendant insurance company on the plaintiff's bad faith claims.  *Id.* at *5–6.

Like the plaintiff in *Wak*, here PCV disputes the reasonableness of QBE's "minimal payment" by pointing to the delta between QBE's September 2021 payment and significantly higher values contained in the Lonergan Report (i.e., an expert report generated years later in litigation).  "There is no doubt that the [Lonergan Report] is evidence of the amount of [PCV's] loss, but it is not sufficient to establish that [QBE's] conduct in [2021] was unreasonable."  *See id.* at *3.  Instead, the Court must consider the reasonableness of QBE's conduct based on the information available to QBE at the time it issued the allegedly unreasonable payment.  *See Schultz*, 429 P.3d at 848.  And "[t]he determination of the reasonableness of [QBE's] actions in [2021] requires application of an objective standard — what a reasonable insurer would have done under the same or similar circumstances."  *See Wak*, 2019 WL 859709, at *3.

QBE argues that PCV has not provided any evidence—expert testimony or otherwise—regarding an objective industry standard.  [Doc. 52 at 12–13; Doc. 64 at 6–7 (citing *Wak*, 2019 WL 859709)].  PCV "offers no evidence as to what insurance industry standards or practices were or how [QBE] deviated from them" in response to QBE's challenge.  *See Wak*, 2019 WL 859709, at *3.  The arguments that PCV does raise in its Response are equally unavailing.

First, like the "laundry list" presented by the plaintiff in *Wak*, here PCV's "avalanche of undisputed evidence" purports to show that QBE acted in bad faith before and during this litigation.  [Doc. 54 at 18 (emphasis omitted)].  But PCV's focus on QBE's "entire course of conduct" fails to cure the fatal defect in PCV's argument:  "the problem [remains]

that [PCV] has simply not come forward with *any* evidence of the standard that should
have governed [QBE's] conduct in [2021]." *See Wak*, 2019 WL 859709, at *3.  And
although Plaintiff correctly asserts that "[e]xpert testimony is not required to establish bad
faith" in every bad faith insurance case, [Doc. 54 at 21 (emphasis omitted)],[7] PCV still
fails to identify any non-expert evidence of the insurance industry standards that govern
QBE's conduct, *see Wak*, 2019 WL 859709, at *4.

Thus, "the record fails to establish what industry standards were so as to create a
genuine dispute of fact as to whether any of [QBE's] actions contravened them." *See
Williams v. Auto-Owners Ins. Co.*, No. 12-cv-00999-MSK-CBS, 2014 WL 12537030, at *7
(D. Colo. Mar. 25, 2014), *aff'd*, 621 F. App'x 914 (10th Cir. 2015).  "In the absence of such
evidence, [PCV] has not come forward with evidence to demonstrate a triable question
as to whether [QBE's] conduct towards [it] was unreasonable or in bad faith."  *See id.*
Therefore, QBE is entitled to summary judgment on PCV's bad faith claims.  *See Stamey
v. Nat'l Gen. Ins. Co.*, No. 15-cv-00560-WJM-MJW, 2016 WL 8540310, at *4 (D. Colo.
Sept. 22, 2016) (entering summary judgment in favor of the insurance company where
the plaintiff "cite[d] no evidence that could establish industry standards or show that [the
insurer] failed to meet them"); *Turner v. State Farm Mut. Auto. Ins. Co.*, No. 13-cv-01843-
MSK-BNB, 2015 WL 1297844, at *6 (D. Colo. Mar. 19, 2015) (holding that summary
judgment in the defendant insurer's favor was appropriate where the plaintiff's expert did

---

[7] The Court also notes that, while PCV quotes three cases in support of its argument that
expert testimony is not necessary to establish industry standards, PCV fails to explain
how any of these cases apply to the facts of *this* case.  [Doc. 54 at 21–22 (quoting *Allen*,
102 P.3d at 345; *Casaretto v. GEICO Cas. Co.*, No. 16-cv-00285, 2017 WL 7731742, at
*4 (D. Colo. Aug. 9, 2017); and *Millman v. State Farm Fire & Cas. Co.*, No. 21-cv-00036-
CMA-NYW, 2021 WL 3206308, at *3 (D. Colo. July 29, 2021))].

"not identify any [i]nsurance [i]ndustry [s]tandard that would govern whether [the insurer's] payment on [the plaintiff's] claim was timely or delayed").

Accordingly, the Court respectfully **GRANTS** Defendant's Motion for Summary Judgment as to Plaintiff's bad faith claims.

### C.    Punitive Damages

Finally, QBE seeks summary judgment as to the request for exemplary damages contained in PCV's Complaint. [Doc. 52 at 19]; *see also* [Doc. 1 at 12]. Specifically, QBE argues that it is entitled to summary judgment because PCV has not complied with the statutory requirements set forth in Colo. Rev. Stat. § 13-21-102(1.5)(a) for requests for punitive damages under Colorado law. [Doc. 52 at 19]. The only remaining claim in this action is one for breach of contract. Under Colorado law, "punitive damages are available only pursuant to statute and are not recoverable in ordinary breach of contract cases." *Ballow v. PHICO Ins. Co.*, 878 P.2d 672, 682 (Colo. 1994) (citations omitted). However, such damages "may be awarded on a claim of bad faith breach of an insurance contract, so long as the breach is accompanied by circumstances of 'fraud, malice, or willful and wanton conduct[.]'" *Id.* (quoting Colo. Rev. Stat. § 13-21-102(1)(a)).

Pursuant to § 13-21-102(1.5)(a), a plaintiff cannot seek exemplary damages in the initial pleading and may move to amend the pleading to add a claim for exemplary damages "only after the exchange of initial disclosures pursuant to Rule 26 of the Colorado Rules of Civil Procedure," and must establish prima facie proof of a triable issue. *See* Colo. Rev. Stat. § 13-21-102(1.5)(a). Section 13-21-102 provides that an award of exemplary damages is permissible when "the injury complained of is attended by circumstances of fraud, malice, or willful and wanton conduct." *Id.* § 13-21-102(1)(a).

Here, PCV alleges in its Complaint that QBE's actions were willful and wanton.  *See generally* [Doc. 1].  "'[W]illful and wanton conduct' means conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff."  Colo. Rev. Stat. § 13-21-102(1)(b).  "Simple negligence cannot support such an award"; rather, "where a defendant is conscious of both its conduct and the existing conditions, and knew or should have known that injury would result, the requirements of [§] 13-21-102 are met."  *Blood v. Qwest Servs.*, 224 P.3d 301, 314 (Colo. App. 2009).

As to the requirement of a prima facie showing, "[p]rima facie evidence is evidence that, unless rebutted, is sufficient to establish a fact."  *Stamp v. Vail Corp.*, 172 P.3d 437, 449 (Colo. 2007) (citation omitted).  Such proof is established by "a reasonable likelihood that the issue will ultimately be submitted to the jury for resolution."  *Id.* (quoting *Leidholt v. Dist. Ct.*, 619 P.2d 768, 771 n.3 (Colo. 1980)).  Parties may offer this proof in the form of discovery and by evidentiary means.  *Id.*  "The question of whether the plaintiff has established sufficient proof to add a claim for exemplary damages lies within the sound discretion of the trial court."  *Id.* (citation omitted).

Here, PCV makes no effort to explain its failure to comply with the procedural requirements set forth in Colo. Rev. Stat. § 13-21-102, nor does Plaintiff cite any authority to suggest it is excused from compliance.  *See* [Doc. 54 at 24–25].  And there is no dispute as to PCV's non-compliance, insofar as PCV included its request for punitive damages in its Complaint and Initial Disclosures, *see* [Doc. 1; Doc. 52-9], without ever seeking leave to amend its Complaint to add exemplary damages.  Given that QBE challenges PCV's request for punitive damages as procedurally infirm, and in the absence of any

counterarguments from PCV with respect to these procedural infirmities, the Court finds that PCV's unexplained failure to adhere to Colorado's exemplary damages statute entitles QBE to summary judgment on the issue of punitive damages. Thus, QBE has met its burden to demonstrate its entitlement to judgment as a matter of law.

Accordingly, the Court respectfully **GRANTS** Defendant's Motion for Summary Judgment with respect to punitive damages.

## II. Plaintiff's Motion for Summary Judgment

PCV seeks summary judgment in its favor on (1) its breach of contract claim; (2) "the issue of whether the deductible in the Policy is recoverable" by QBE; and (3) its statutory bad faith claim. *See* [Doc. 51 at 24]. Mindful to treat each cross-Motion independently, this Court addresses each issue in turn.

### A. Breach of Contract

To establish a claim for breach of contract under Colorado law, a plaintiff must prove (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).

Here, the Parties do not dispute that the June 2021 hailstorm caused significant damage to the Property, which was a covered loss under the Policy, pursuant to which QBE was required to pay PCV the "full replacement costs to remedy that damage" upon PCV's timely Claim to recover its replacement costs.[8] [Doc. 51 at ¶¶ 1–5; Doc. 55 at 1

---

[8] Whether "PCV timely filed a claim to recover from QBE the replacement costs owed by QBE to PCV" is unclear from the record. *Compare* [Doc. 51 at 15 (citing [*id.* at ¶ 5])], *with* [*id.* at ¶ 5 ("Five days after the hailstorm, on June 9, 2021, PCV filed a claim with QBE, and QBE assigned an adjuster to the claim.")], *and* [Doc. 51-4 at 11 (under the replacement cost coverage and payment terms of the Policy, QBE is not obliged to "pay

Case No. 1:22-cv-02364-NYW-SBP    Document 68    filed 03/21/25    USDC Colorado
pg 22 of 26


¶¶ 1–5].    PCV's entitlement to summary judgment thus turns on whether QBE "substantially underpaid" PCV's Claim.  [Doc. 51 at 14 (capitalization altered)].    PCV argues that summary judgment on its breach of contract claim is warranted because "there is no dispute that QBE paid far less than even its own expert and corporate representative admit that QBE owed PCV."  [Doc. 51 at 16].    The Court respectfully disagrees for at least three reasons.

First, whether QBE underpaid PCV's Claim remains in dispute.  PCV's assertion that QBE's corporate representative, Ms. Burkey, indisputably "agreed" that QBE owes PCV at least $118,159 relies on an impermissibly one-sided reading of the record.  *Compare* [Doc. 51-8 at 48:5–14 ("Q.  Does QBE agree that [$118,159] is a minimum payment that should be made to the Players Club?  A.  No. . . . We paid the claim, based off of the estimate that we had at the time.  And generally, is what will happen is if the insured or the public adjuster is not in agreement with us, we will work that out during the course of the claim.  And they filed suit before that process was able to be completed." (emphasis added)], *with* [*id.* at 52:2–21 ("Q.  Do you have an understanding as to whether your cost expert came up with a cost that's different from the $1,500 that was paid out?  A.  Yes. . . . Q.  And what's your understanding?  A.  That they came up with a different amount than what our independent adjuster had.  Q.  A higher amount; correct?  A. Correct, yeah.  Q.  And do you agree with that higher amount? . . . . A.  Yes.")].  It is not

---

more than . . . [the] [a]ctual cash value of the damage until the repair or replacement is completed" and, if "the actual cash value of the damage has been paid," the Policy permits PVC to "still make a claim on a replacement cost basis if [it] notif[ies] [QBE] that repair or replacement has commenced within 200 days after the loss or damage")].

for the Court to decide the credibility of witnesses or the weight to give each piece of evidence. These determinations must be reserved for the finder of fact.

Second, PCV provides no authority for its proposition that QBE breached the Policy by failing to pay PCV the $118,159 replacement cost value set forth in Mr. Lonergan's expert opinion. *See generally* [Doc. 51]. And the Court is neither bound by, nor persuaded by Plaintiff's reliance on, *Millman v. State Farm Fire & Casualty Co.*, No. 21-cv-00036-CMA-NYW, 2021 WL 3206308, at *3 (D. Colo. July 29, 2021), which is an unpublished, non-binding case decided in the context of a motion for default judgment. Unlike the summary judgment record and full briefing in this case, the allegations set forth in the plaintiff insured's complaint in *Millman* were deemed admitted upon the defendant insurer's failure to answer and analyzed under an entirely different legal standard. *See id.* at *2.

Finally, PCV asks the Court to compare apples and oranges insofar as it asserts that the delta between the <u>replacement cost value</u> estimate set forth in the Lonergan Report and the <u>actual cash value</u> payment that QBE made to PCV in September 2021 demonstrates QBE's "substantial[] underpa[yment]" of PCV's claim. [Doc. 51 at 14–17]. Relevant here, the Policy provides that, for replacement cost coverage, QBE "will pay no more than the least of . . . (1) The cost to repair or replace the property at the same site . . . without deduction for depreciation," or "(2) The amount actually and necessarily expended in repairing or replacing the property at the same site." [Doc. 51-4 at 11]. Even with respect to "guaranteed replacement cost" coverage, however, QBE is not obliged to "pay more than . . . [the] [a]ctual cash value of the damage until the repair or replacement is completed." [*Id.*]. Where "the actual cash value of the damage has been paid," the

Policy permits PVC to "still make a claim on a replacement cost basis if [it] notif[ies] [QBE] that repair or replacement has commenced within 200 days after the loss or damage." [*Id*.]. Thus, the Policy treats actual cash value and replacement cost value as distinct metrics.

The Parties do not dispute that, by letter dated September 21, 2021, QBE outlined its position and made payment to the HOA in the amount of $1,587.05, "explaining the amount is the <u>actual cash value</u> . . . for the loss as outlined in the Policy and payment terms, less the Hail Deductible and recoverable appreciation." [Doc. 55 at 7 ¶ 5 (emphasis added)]; *see also* [Doc. 55-6]. Nor is there any dispute that the $118,159 value set forth in the Lonergan Report represents the "total cost" calculated "for 11 full roof replacements . . . combined with repair costs for [the] remaining locations," less the Hail Deductible. [Doc. 51-26 at 8]. In other words, the $118,159 represents the <u>replacement cost value</u> minus the Hail Deductible. The evidentiary record therefore establishes that QBE's $1,587.65 payment represents a calculation of the actual cash value, whereas the $118,159 figure in the Lonergan Report represents a calculation of the replacement cost value.

Notwithstanding the Policy's distinction between actual cash value and replacement cost value, PCV insists on comparing the two figures, *see* [Doc. 51 at 15 (comparing the $1,587.65 "that QBE actually paid PCV" to the $118,159 that "QBE should have paid PCV" and asserting that the $1,587.65 payment "is less than 1/74th of what QBE now admits it owes PCV")], without explaining how or why QBE's payment and the estimate in the Lonergan Report can or should be treated as the same calculation. But PCV provides no basis for this Court to conclude that the value of a metric calculated by

an expert during the course of litigation establishes, as a matter of law, that QBE materially breached the Policy by issuing a smaller payment—for a different metric—in September 2021.

Thus, the Court finds that genuine disputes of material facts remain that preclude summary judgment on PCV's breach of contract claim. Accordingly, the Court respectfully **DENIES** PCV's Motion for Summary Judgment on this issue.

### B.     The Hail Deductible

With respect to PCV's request for summary judgment on the applicability of the Hail Deductible to its Claim, Plaintiff's Motion for Summary Judgment repeats the same arguments raised in PCV's Response to Defendant's Motion for Summary Judgment. *Compare* [Doc. 51 at 17–19], *with* [Doc. 54 at 13–17]. Moreover, PCV's argument that QBE "is not entitled to the Policy benefit of reducing PCV's damages in the amount of the deductible" relies on a finding that the "QBE materially breached its Policy with PCV." [Doc. 51 at 17]. This Court has already concluded that the Hail Deductible applies to PCV's Claim as a matter of law. *See supra* Section I.A. For the reasons discussed above, PCV has failed to demonstrate that it is entitled to summary judgment on its breach of contract claim. *See supra* Section II.A. Accordingly, the Court will also deny Plaintiff's Motion for Summary Judgment as to the applicability of the Hail Deductible.

### C.     Statutory Bad Faith

PCV seeks summary judgment on its statutory bad faith claim because "[t]o this day, QBE has not paid, or offered to pay, PCV the amount of $118,159," which PCV characterizes as indisputably the "minimum that QBE owes PCV." [Doc. 51 at 23–24]. The bad faith sections of Plaintiff's Motion for Summary Judgment and Plaintiff's

Response to Defendant's Motion for Summary Judgment are nearly identical. *Compare* [*id.* at 19–24], *with* [Doc. 54 at 18–23]. The Court has already granted judgment in QBE's favor on this claim; indeed, Plaintiff's Motion for Summary Judgment suffers the same flaws as its Response to Defendant's Motion for Summary Judgment. Here, too, Plaintiff's Motion for Summary Judgment fails to identify the industry standards governing QBE's conduct, which is an essential element of PCV's statutory unreasonable delay/denial claim. Thus, PCV has not demonstrated that "there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Accordingly, Plaintiff's Motion for Summary Judgment is respectfully **DENIED**.

## CONCLUSION

For the reasons set forth herein, **IT IS ORDERED** that:

(1)   Plaintiff's Motion for Partial Summary Judgment [Doc. 51] is **DENIED**;

(2)   Defendant's Motion for Partial Summary Judgment [Doc. 52] is **GRANTED**; and

(3)   A telephonic Status Conference is **SET** for **May 1, 2025 at 1:00 p.m.**, for purposes of setting a Final Pretrial/Trial Preparation Conference and trial date in this matter. The Parties shall participate using the following dial-in information: **571-353-2301; Access Code: 783456374**.

DATED:  March 21, 2025                            BY THE COURT:

_____
Nina Y. Wang
United States District Judge